**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
AT JACKSON**

| | | |
|---|---|---|
| **MCKENZIE MEDICAL CENTER, PC**<br>**and WMC PARTNERSHIP, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 1:23-cv-01045-JDB-jay** |
| **vs.** | ) | |
| | ) | **Removal from Weakley Co. Chancery** |
| **SELECTIVE INSURANCE COMPANY** | ) | **Court, Case No. 25549** |
| **OF SOUTH CAROLINA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**DEFENDANT SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

For its Memorandum of Law in Support of its Motion for Summary Judgment, Selective Insurance Company of South Carolina ("Selective") states:

**PROCEDURAL HISTORY**

On February 17, 2023, McKenzie Medical Center, PC and WMC Partnership, LLC (collectively "Counter-Defendants") filed their Request for Umpire Selection ("Complaint") against Selective in the Chancery Court of Weakley County, Tennessee. On March 27, 2023, Selective timely removed the suit from the Chancery Court of Weakley County, Tennessee to this Federal Court [Doc. No. 1]. On April 27, 2023, Selective filed its Answer and Counter Claims Against Plaintiffs. [Doc. No. 14]. In the countercomplaint, Selective asserted four different claims for declaratory judgment related to coverage disputes arising under the insurance policy. [*Id*.]. Count one seeks a declaration from the Court that there is no coverage for business income losses. Count two seeks a declaration from the Court that Counter-Defendants' business personal property claim is limited by their neglect and failure to mitigate. Count three seeks a declaration from the

Court that Counter-Defendants are not entitled to replacement cost value under the Policy. And count four seeks a declaration from the Court that Counter-Defendants breached the Policy and thus are not entitled to the appraisal process. Counter-Defendants did not, and as of the time of the filing of this Motion have not, filed an answer to the Countercomplaint.

On May 9, 2023, pursuant to Local Rule 16.2, the Court held a scheduling conference. During the scheduling conference, Selective proposed that this matter be bifurcated into two separate phases. The first phase of the case would deal with the insurance coverage issues asserted in Selective's counterclaims. Following the resolution of the coverage issues, the case would then proceed to phase 2 where the Court would address the issue of the appointment of an umpire, if necessary. The Court agreed with Selective's proposed bifurcation of this case and entered a Scheduling Order reflecting the same. [Doc. No. 17]. The Court also included in the scheduling order various deadlines for each phase of the case, including initial disclosure deadlines, expert witness disclosure deadlines, and discovery deadlines. [*Id.*].

Since the entry of the Scheduling Order, Counter-Defendants have continually failed to comply with deadlines established by the Rules of Civil Procedure and the Scheduling Order. First, as mentioned above, Counter-Defendants have not filed an answer or response to Selective's counterclaims.

Second, the Scheduling Order required the parties to exchange initial disclosures on or before May 23, 2023. [*Id.*]. While Selective served its initial disclosures by the stated deadline, Counter-Defendants failed to do so and, as of the time of the filing of his Motion, have still not served initial disclosures.

Third, as explained below, Counter-Defendants have failed to meaningfully partake in the discovery process. On June 6, 2023, Selective served Defendant's 1st Set of Interrogatories,

Requests for Production of Documents, and Requests for Admission to Plaintiffs. [*See* Exhibit A to Statement of Material Facts (hereinafter "SOMF")]. Per the Federal Rules of Civil Procedure, Counter-Defendants responses to these discovery requests were due on or before July 7, 2023. Counter-Defendants failed to timely serve responses to the discovery requests, including the requests for admission. As a result of Counter-Defendant's failure to serve responses to the requests for admission, those requests are deemed admitted for all purposes pursuant to Federal Rule of Civil Procedure 36. Regarding the interrogatories and requests for production of documents, Selective was forced to file a Motion to Compel after Counter-Defendants continued failure to provide the responses. [*See* Doc. No. 20]. The Court granted the Motion to Compel on September 6, 2023. [Doc. No. 26].

On August 11, 2023, in response to Selective's Motion to Compel, Counter-Defendants served purported responses to Selective's interrogatories, requests for production of documents, and requests for admission. [*See* Exhibit B to SOMF]. Prior to serving the responses to the requests for admission, Counter-Defendants neither moved the Court, nor received from the Court, permission to withdraw the admissions and serve responses. As a result, the service of responses to the requests for admission are a nullity and the admissions are still deemed admitted for all purposes under the rules. *See* Fed. R. Civ. P. 36. Further, the purported responses to the interrogatories and requests for production of documents did not comply with the Federal Rules of Civil Procedure, were evasive and non-responsive, and Counter-Defendants failed to produce a single document in response to Selective's requests for production of documents. [*See* Exhibit B to SOMF]. In conjunction with the service of the purported discovery responses, Counter-Defendants also filed a one-page Response to Motion to Compel. [Doc. No. 22]. The Response claimed that Counter-Defendants responded to the interrogatories and requests for production of

documents, that the delay in providing response was due to an automobile accident of an unnamed third-party contractor, and that the Motion to Compel is now moot. [Doc. No. 22]. On August 11, 2023, Selective moved the Court for leave to file a reply brief in support of the Motion to Compel. [Doc. No. 23]. This motion was granted and Selective filed its reply on August 16, 2023. [Doc. Nos. 24 and 25]. On September 6, 2023, the Court granted Selective's Motion to Compel. [Doc. No. 26]. In this Order, the Court required Counter-Defendants to serve Rule 26(a)(1) initial disclosures within fourteen (14) days of the date of the entry of the Order. [*Id.*]. This Court likewise found that because Counter-Defendants' purported discovery responses were wholly inadequate and violative of not only the letter but also the spirit of the Rules of Civil Procedure, any objections to the discovery requests had been waived. [*Id.*]. The Court ordered Counter-Defendants to provide responses to the interrogatories and requests for production of documents within twenty-one days of the date of the entry of the Order. [*Id.*]. Counter-Defendant's refusal to partake in the discovery process is prejudicial to Selective's ability to comply with certain of the deadlines in the Court's Scheduling Order.

Finally, the Scheduling Order required Counter-Defendants (or any party with the burden of proof) to disclose expert witnesses by August 11, 2023. [Doc. No. 17]. Counter-Defendants failed to disclose any expert witnesses, including experts related to their claim for business interruption expenses and damaged business personal property under the Policy, by the stated deadline of August 11, 2023.

**FACTS**

## I. THE POLICY

Selective issued a Businessowners Coverage Policy, Policy No. S 2112243, to named insureds McKenzie Medical Center, PC and WMC Partnership, LLC ("Counter-Defendants") with

a policy period from October 1, 2021 to October 1, 2022 (the "Policy"). The Policy covers the property located at 136 S. Wilson Street, Dresden TN 38255 ("Subject Property"). [*See* Exhibit C to SOMF]. The Policy provides coverage, subject to the Policy's terms and exclusions, with limits of $852,958 for the building located on the Subject Property, $200,000 for Business Personal Property located on the Subject Property, and Business Income / Extra Expense for actual loss sustained for up to 12 months. [*Id.*].

Regarding the valuation of loss resulting from a covered incident, the Policy states:

**d.** Except as provided in Paragraphs **(2)** through **(7)** below, we will determine the value of Covered Property as follows:

**(1)** At replacement cost without deduction for depreciation, subject to the following:
***
**(c)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(d)** We will not pay on a replacement cost basis for any loss or damage:
**(i)** Until the lost or damaged property is actually repaired or re-placed; and
**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.
***
**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all of the terms of this policy, and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

[*Id.*].

The Policy places a duty upon the insured to protect the covered property from further damage following a covered event. [*Id.*]. Specifically, the policy states:

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

***

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section **I** — Property. How-ever, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

[*Id.*]. The Policy likewise contains the following neglect exclusion:

### k. Neglect

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

[*Id.*].

In regard to business income, the Policy provides:

**Business Income**
**1. Direct Damage**

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1000 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises mean:

**a**. The portion of the building which you rent, lease or occupy;

**b.** The area within 1000 feet of the building or within 1000 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**c.** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

If the Schedule shows for Business Income:

> **a.** Actual Loss Sustained, then we will pay the actual loss of Business Income that occurs within 12 consecutive months following the date of direct physical loss or damage unless optional coverage for 18 or 24 consecutive months is shown in the Schedule; or
>
> **b.** A maximum dollar limit, then we will pay for loss of Business Income that occurs within 12 consecutive months following the date of direct physical loss or damage, unless optional coverage for 18 or 24 consecutive months is shown in the Schedule, subject to the Limit of Insurance shown in the Schedule.

***

The following applies to all Business Income Additional Coverages:

> **1.** Business Income means the:
>
> > **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and
> >
> > **b.** Continuing normal operating expenses incurred, including payroll.
>
> **2.** Suspension means:
>
> > **a.** The partial slowdown or complete cessation of your business activities; and
> >
> > **b.** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

[*Id.*].

The Policy defines "period of restoration" as:

"Period of Restoration" means the period of time that:
> **a.** Begins:
>
> > **(1)** For Business Income with no hour waiting period after the time of direct physical loss or damage caused by or resulting from a Covered Cause of

Loss at the described premises or dependent property unless one of the optional waiting period endorsements is attached to this policy; or

**(2)** For Extra Expense immediately after the time of direct physical loss or damage caused by or resulting from a Covered Cause of Loss at the described premises; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the described premises or dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

[*Id.*].

Finally, the Policy provides for an appraisal process should the parties disagree on the amount of loss. Specifically, the Policy states:

**2. Appraisal**

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

[*Id.*].

## II. THE INCIDENT AND CLAIMS

On or about December 11, 2021, a storm and/or tornado caused damage to portions building located on the Subject Property. [Exhibit D to SOMF, Aff. of N. Plassman at ¶ 4.] The Subject Property contains an approximately 6,000 square foot medical facility. [*Id.* at ¶ 5.] As for

the interior of the building, the water and wind damaged the insulation, HVAC, ceiling tiles, and drywall in portions of the building. [*Id.* at ¶ 6.] The walls needed to be dried out and repainted. [*Id.* at ¶ 6.] The flooring in the building was concrete and undamaged. [*Id.* at ¶ 6.] The items located inside the front portion of the building suffered damage from debris, water, and wind. Those items included seats, desks, computers, lab supplies, and medical supplies and Selective issued payment. [*Id.* at ¶ 7.] Some of the items in the back portion of the building, which included x-ray equipment, were largely undamaged and only had dust and light debris covering them. [*Id.* at ¶ 8, Exhibit 1.] These items should have been able to be cleaned up and removed from the Subject Property for storage while repairs were being completed to the building. [*See* Exhibit A to SOMF; Request for Admission Nos. 10-11].

In the days and weeks following the storm, Counter-Defendants failed to mitigate their damages, including but not limited to, leaving the building and property located inside of the building open to the elements. [Exhibit D to SOMF, Aff. of N. Plassman at ¶ 9, Exhibit 2; Exhibit A, Request for Admission No. 11]. Counter-Defendants failed to use reasonable means to protect the Subject Property and items located inside of the building. [Exhibit A, Request for Admission No. 5]. Counter-Defendants have admitted that they failed to take reasonable steps to protect the Subject Property from further loss or damage following the storm. [Exhibit A, Request for Admission No. 5] Counter-Defendants have admitted that the building, and property located therein, was left open to the elements following the storm. [Exhibit A, Request for Admission No. 11] Counter-Defendants have likewise admitted that items located inside of the back portion of the building, namely the x-ray equipment, were not damaged in the storm. [Exhibit A, Request for Admission No. 10].

Almost immediately following the storm, Counter-Defendants resumed business operations. [Exhibit E to SOMF, Aff. of Mike Magner at Exhibit A; Exhibit A to SOMF, Request for Admission No. 8-9]. Medical providers that were previously seeing patients at the Subject Property began seeing patients at a new, and now permanent, location located at 811 Morrow Street, Dresden, TN 38225. [*Id.*]. During the claims investigation process, Selective hired Mike Magner to evaluate the alleged business income loss claim that Counter-Defendants submitted. [Exhibit E to SOMF, Aff. of M. Magner at ¶ 3]. During this process, Mr. Magner requested documentation from Counter-Defendants in order to evaluate the claim. [*Id.* at ¶ 4]. This documentation included profit and loss statements, production reports, summaries of total patient charges and collections, and payroll records. [*Id.*]. Following his analysis, Mr. Magner determined that Counter-Defendants did not suffer any lost patient charges and/or lost revenue as a result of the storm. [*Id.* at ¶ 8-9, Exhibit A]. Further, Counter-Defendants have admitted that they did not sustain any actual loss of business income as a result of the storm, that their business income did not decrease after the storm, that they have no documents to establish a loss of business income after the storm, and that there was no partial slowdown or complete cessation of business activities following the storm, all of which was confirmed by Selective's forensic accountant. [Exhibit A to SOMF, Request for Admission Nos. 6-9, 14-15].

On or about May 15, 2022, Counter-Defendants' public adjuster, William Griffin, submitted Counter-Defendants' final statement of loss. [Exhibit D to SOMF, Aff. of N. Plassman at ¶ 12, Exhibit 3]. Counter-Defendants' valued the total loss at $2,855,124.08, broken down as follows: $1,997,670.55 actual cash value for property damage, $247,180 replacement cost value for business personal property, $12,227.53 businessowners schedule plus, and $598,046 for business income/extra expense. [*Id.*]. On May 19, 2022, Selective sent a letter to Counter-

Defendants' explaining that their proof of loss was rejected because selective was "not in agreement with the assessment of damages and the lack of supporting documents." [*Id.* at ¶ 13, Exhibit 4]. At the same time, Selective also provided Counter-Defendants with a revised statement of loss and settlement letter that outlined Selective's calculation of the loss following its investigation. [*Id.* at ¶ 14, Exhibit 5]. Selective valued the total loss at $800,486.36, broken down as follows: $719,371.20 actual cash value for property damage, $68,884.63 for business personal property, and $12,227.53 for businessowners schedule plus. [*Id.*]. As stated above, Selective's expert determined that there was no business income loss. Selective has paid Counter-Defendants $800,483.36, the full value of the loss as determined by its investigation. [*Id.* at ¶ 16].

On July 18, 2022, Counter-Defendants sent a written demand invoking the appraisal process as outlined in the Policy. [*Id.* at ¶ 18; Exhibit 6]. Per the process, each party selected their own appraiser. [*See* Exhibit C to SOMF]. Counter-Defendants selected Ben Perry and Selective selected Chris Green. [Exhibit D to SOMF, Aff. of N. Plassman at ¶ 19]. The two appraisers then began discussions to select an umpire, per the process outlined in the Policy. Counter-Defendants' appraiser proposed John C. Robinson, Jon Pruitt, Jon Linville, or Matt Dugan to serve as the umpire. [*Id.* at ¶ 20.]. Selective's appraiser proposed Nathan Smith, Ken Abernathy, or Chis Murphree. [*Id.* at ¶ 21]. After some discussions, the appraisers were not able to come to an agreement as to who should serve as the umpire for the appraisal process and Counter-Defendants initiated this litigation.

### STANDARD OF REVIEW

A party moving for summary judgment must prove that its motion satisfies the requirements of Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the party seeking summary judgment makes a properly supported motion under Rule 56, the non-moving party may not rest upon the allegations or denials of its pleadings, but rather must set forth specific facts at the summary judgment stage showing there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party may not rely on legal conclusions or the allegations of denials in its pleadings to carry its burden. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

When determining whether a genuine dispute of material fact exists in a particular case, the court must determine (1) whether the facts at issue are material according to the pertinent substantive law and (2) whether the dispute over those facts is genuine, or such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-48. Not every factual dispute requires a denial of a motion for summary judgment. *Id.* To warrant denial of a motion for summary judgment, the factual dispute must be material, in that it must be a fact "that might affect the outcome of the suit under the governing [substantive] law." *Id.*

"There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. Summary judgment may be granted if the evidence is "merely colorable" or "not significantly probative." *Id.* In other words, the non-moving party must "put up or shut up" once the moving party has satisfied its burden. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).

## LAW AND ARGUMENT

I.  **STANDARD FOR INSURANCE POLICY INTERPRETATION**

In general, courts should construe insurance policies in the same manner as any other contract. *American Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn.2000). "An insurance policy must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning." *Naifeh v. Valley Forge Life Ins. Co.,* 204 S.W.3d 758, 768 (Tenn.2006) (*citing Parker v. Provident Life & Acc. Ins. Co.,* 582 S.W.2d 380, 383 (Tenn. 1979)). The policy language must be taken and understood in its plain, ordinary, and popular sense. *Hutchison*, 15 S.W.3d at 814.

II.  **THERE IS NO COVERAGE FOR BUSINESS INCOME LOSSES**

Counter-Defendants' included in their proof of loss a claim for business income losses. [Exhibit D to SOMF, Aff. of N. Plassman at Exhibit 3] Count one of Selective's countercomplaint seeks a declaration from this Court that there are no business income losses and/or there is no coverage for Counter-Defendants' alleged business income losses. [Doc. No. 14].

In *Cont'l Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992), the Tennessee Supreme Court explained the purpose of business interruption insurance:

> The purpose of business interruption insurance is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the position it would have occupied if the interruption had not occurred. A related rule is that a policy of this type may not be used to place the insured in a better position than it would have occupied in the absence of the catastrophe.

*Id.* at 934.

The Policy at issue specifically states: "We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". [*See* Exhibit C to SOMF]. Thus, in order for there to be business income losses and/or coverage

for business income losses, three elements must be met — (1) actual loss of business income, (2) sustained due to the necessary suspension of operations, and (3) the actual loss must occur during the period of restoration. In this case, none of these elements are met.

First, there was no actual loss of Business Income. The Policy defines "Business Income" as

> Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

> Continuing normal operating expenses incurred, including payroll.

[*Id.*]. During the claims investigation process, Selective hired Mike Magner to evaluate the alleged business income loss claim that Counter-Defendants submitted. [Exhibit E to SOMF, Aff. of M. Magner at ¶ 3]. During this process, Mr. Magner requested documentation from Counter-Defendants in order to evaluate the claim. [*Id.* at ¶ 4]. This documentation included profit and loss statements, production reports, summaries of total patient charges and collections, and payroll records. [*Id.*]. Following his analysis, Mr. Magner determined that Counter-Defendants did not suffer any lost patient charges and/or lost revenue as a result of the storm. [*Id.* at Exhibit A]. Further, Counter-Defendants have admitted that they did not sustain any actual loss of business income as a result of the storm, that their business income did not decrease after the storm, that they have no documents to establish a loss of business income after the storm, and that there was no partial slowdown or complete cessation of business activities following the storm, all of which was confirmed by Selective's forensic accountant. [Exhibit A to SOMF, Request for Admission Nos. 6-9, 14-15]. Thus, there was no actual loss of income and therefore no coverage under the policy for loss of business income.

Second, even if there was loss of business income (which there was not), there is no coverage under the Policy because Counter-Defendants did not suspend their business operations. The Policy defines suspension as "[t]he partial slowdown or complete cessation of your business activities…" [*See* Exhibit C to SOMF]. Counter-Defendants have expressly admitted that there was no partial slowdown or complete cessation of their business activities following the incident. [Exhibit A to SOMF, Request for Admission Nos. 7]. Counter-Defendants admission is expressly confirmed by the results of Selective's forensic accountant, Mike Magner. [*See* Exhibit E to SOMF, Aff. of M. Magner]. Thus, because there was no slowdown or cessation of business activities, there is no coverage for business income losses under the Policy.

Finally, even if there was loss of business income due to the suspension of Counter-Defendants' operations (which there was not), there is no coverage under the policy because Counter-Defendants almost immediately resumed their business at a new, permanent location shortly after the storm. The Policy defines "period of restoration" as:

"Period of Restoration" means the period of time that:

    **a.** Begins:

        **(1)** For Business Income with no hour waiting period after the time of direct physical loss or damage caused by or resulting from a Covered Cause of Loss at the described premises or dependent property unless one of the optional waiting period endorsements is attached to this policy; or

        **(2)** For Extra Expense immediately after the time of direct physical loss or damage caused by or resulting from a Covered Cause of Loss at the described premises; and

    **b.** Ends on the earlier of:

        **(1)** The date when the property at the described premises or dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

        **(2)** The date when business is resumed at a new permanent location.

[*See* Exhibit C to SOMF]. Counter-Defendants' have admitted that they resumed business operations at 811 Morrow Street, Dresden, Tennessee. [Exhibit A to SOMF, Request for Admission No. 8]. Counter-Defendants further admitted that 811 Morrow Street is the new permanent location for the business. [Exhibit A to SOMF, Request for Admission No. 9]. Because Counter-Defendants resumed their business operations at their new, permanent location shortly after the storm, the period of restoration ended shortly after the storm.

As explained above, the purpose of business interruption insurance is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the position it would have occupied if the interruption had not occurred. *DNE Corp.,* 834 S.W.2d at 934. A policy of this type may not be used to place the insured in a better position than it would have occupied in the absence of the catastrophe. *Id.* Because there was no actual loss of business income and no suspension of Counter-Defendants' business operations, and because the period of restoration ended shortly after the storm, there is no coverage for Counter-Defendants' alleged business income losses. Any finding to the contrary would put Counter-Defendants in a better position than it would have occupied absent the storm. Thus, Selective is entitled to summary judgement on their first claim for declaratory judgment and a declaration from this Court that there is no coverage for business income losses under the Policy as a matter of law.

## III. COVERAGE FOR BUSINESS AND PERSONAL PROPERTY IS LIMITED BY COUNTER-DEFENDANTS' NEGLECT AND FAILURE TO MITIGATE

Counter-Defendants' included in their proof of loss a claim for business personal property in the amount of $247,180. [Exhibit D to SOMF, Aff. of N. Plassman at Exhibit 3]. Count two of Selective's countercomplaint seeks a declaration from this Court that coverage for business

personal property is limited by Counter-Defendants' neglect and failure to mitigate.  [Doc. No. 14].

The Policy places a duty upon the insured to protect the covered property from further damage following a covered event.  Specifically, the policy states:

**3. Duties In The Event Of Loss Or Damage**
    **a.** You must see that the following are done in the event of loss or damage to Covered Property:
                ***
    **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section **I** — Property. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

[*See* Exhibit C to SOMF].  The Policy likewise contains the following neglect exclusion:

**k. Neglect**

    Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

[*Id.*].  Counter-Defendants failed to use reasonable means to protect the Subject Property and items located inside of the building. [Exhibit D, Aff. of N. Plassman at ¶ 9; Exhibit A to SOMF, Request for Admission No. 5].  Counter-Defendants have admitted that they failed to take reasonable steps to protect the Subject Property from further loss or damage following the storm. [Exhibit A, Request for Admission No. 5]  Counter-Defendants have admitted that the building, and property located therein, was left open to the elements following the storm. [Exhibit A, Request for Admission No. 11]  Counter-Defendants have likewise admitted that items located inside of the back portion of the building, namely the x-ray equipment, were not damaged in the storm. [Exhibit A, Request for Admission No. 10]. Any alleged damage or loss to this equipment is a direct result of the Counter-Defendants' neglect and failure to mitigate and is thus excluded

from coverage under the Policy. Thus, Selective is entitled to a declaration from this Court that Counter-Defendants' claims for damage to business personal property are excluded from coverage under the Policy.

## IV. COUNTER-DEFENDANTS ARE NOT ENTITLED TO REPLACEMENT COST VALUE

Count three of Selective's counterclaim seeks a declaration from this Court that Counter-Defendants are precluded from recovering any additional payments for recoverable depreciation that they may have been entitled to under a replacement cost value of loss. The Policy states "You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage." [*See* Exhibit C to SOMF]. The Policy further provides that Selective "will not pay on a replacement cost basis for any loss or damage: Until the lost or damaged property is actually repaired or re-placed; and Unless the repair or replacement is made as soon as reasonably possible after the loss or damage." [*Id.*].

In, *State Auto. Prop. & Cas. Co. v. There is Hope Cmty. Church ex rel. Blacklock,* 2014 WL 2003302, (W.D. Ky. 2014), the District Court analyzed an insurance policy with identical language. In that case, the insurance company argued that the insured's actions prevented him from recovering an additional $64,565.45 as replacement costs because he failed to notify of his intention to rebuild or replace the property within 180 days. *Id.* at *4. Additionally, the plaintiff noted that the insured did not even have future plans to rebuild the building. *Id.* The District Court found at the summary judgment stage that the insured was not entitled to recover the RCV funds because he did not offer any proof that he notified plaintiff of his intent to rebuild within 180 days as required by the policy and it was undisputed that the building had not been rebuilt. *Id.*

In this case, Counter-Defendants have admitted that they made a claim for loss or damage to the Subject Property on an actual cash value basis. [Exhibit A to SOMF, Request for Admission No. 1]. Counter-Defendants did not, within 180 days of making the claim for loss or damage, notify Selective of their intent to make a claim on a replacement cost basis such that they would be entitled to recoverable depreciation under the Policy. [Exhibit D to SOMF, Aff. of N. Plassman at ¶ 17; Exhibit A to SOMF, Request for Admission No. 2]. Further, Counter-Defendants have also admitted that no repairs have been made to the Subject Property and that if they would have used reasonable speed to repair or replace the building, the building would have been repaired, rebuilt, or replaced by now. [Exhibit A to SOMF, Request for Admission Nos. 3-4]. Thus, Counter-Defendants are precluded from recovering any additional payments for recoverable depreciation that they may have been entitled to under a replacement cost value of loss.

## V.   COUNTER-DEFENDANTS' BREACHED THE POLICY AND ARE NOT ENTITLED TO THE APPRAISAL PROCESS

Finally, the Policy provides for an appraisal process should the parties disagree on the amount of loss. Specifically, the Policy states, "If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction." [*See* Exhibit C].

On July 18, 2022, Counter-Defendants sent a written demand invoking the appraisal process as outlined in the Policy. [Exhibit D to SOMF, Aff. of N. Plassman at ¶ 18, Exhibit 6]. Per the process, each party selected their own appraiser. [*See* Exhibit C to SOMF]. Counter-Defendants selected Ben Perry and Selective selected Chris Green. [Exhibit D to SOMF, Aff. of N. Plassman at ¶ 18, Exhibit 6]. The two appraisers then began discussions to select an umpire,

per the process outlined in the Policy. Counter-Defendants' appraiser proposed John C. Robinson, Jon Pruitt, Jon Linville, or Matt Dugan to serve as the umpire. Selective's appraiser proposed Nathan Smith, Ken Abernathy, or Chis Murphree. [*Id.* at ¶ 20-21].  After some discussions, the appraisers were not able to come to an agreement as to who should serve as the umpire for the appraisal process.  As a result, on February 17, 2023, Counter-Defendants filed their Complaint against Selective in the Chancery Court of Weakley County, Tennessee.  In the Complaint, rather than submitting to the Court the list of umpires proposed by their appraiser, Counter-Defendants instead provided this Court with a new list of appraisers that it selected.  [Exhibit A to SOMF, Request for Admission No. 13]. Indeed, Counter-Defendants admitted that the list of proposed umpires in the Complaint was not selected by their appraiser. [Exhibit A to SOMF, Request for Admission No. 13]. This constitutes a breach of the Policy as the umpire is to be selected by the appraisers and/or Court, and not by the parties themselves.  Because Counter-Defendants have breached the Policy, they are not entitled to the appraisal process.

## CONCLUSION

Based on the foregoing, Selective respectfully requests that his Court enter summary judgment in its favor and declare that:

    a. Counter-Defendants have breached the appraisal provisions of the Policy;
    b. there is no coverage under the Policy for Business Income losses;
    c. coverage is limited as to Counter-Defendants' Business Personal Property Claims based on Counter-Defendants' failure to mitigate and neglect; and
    d. Counter-Defendants have waived their right to seek the Replacement Cost Value under the Policy.

Respectfully submitted,

*/s/ Jeremey R. Goolsby*
Jeremey R. Goolsby, No. 34505
Chris Burnside (*pro hac vice*)
FROST BROWN TODD LLP
150 3rd Avenue South, Suite 1900
Nashville, TN  37201
615-251-5550 Telephone
615-251-5551 Facsimile
jgoolsby@fbtlaw.com
cburnside@fbtlaw.com

*Attorneys for Selective Insurance Company of South Carolina*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 13, 2023, I electronically filed the foregoing with the clerk of the court by using CM/ECF system. I further certify that a true and accurate copy of the foregoing was served upon the following via U.S. Mail, first class, postage prepaid:

Drayton Berkley
The Berkley Law Firm, PLLC
1255 Lynnfield Road, Suite 226
Memphis, TN  38119
attorneyberkley@gmail.com

*Attorney for Plaintiffs*

*/s/ Jeremy R. Goolsby*
Jeremey R. Goolsby

0146160.0768343   4885-0455-8197